## HUMBLE OIL & REFINING CO. v. McLEAN.*
### (No. 1160.)

(Court of Civil Appeals of Texas. Beaumont. Dec. 23, 1924. Rehearing Denied Jan. 7, 1925.)

**1. Appeal and error ☞273(5)—Exception to charge as general presents nothing for review.**

Exception to court's charge as general, which points out no specific objectionable elements, presents nothing for review.

**2. Libel and slander ☞139—Answers to special issues on actual and punitive damages held not inconsistent.**

In suit for slander of title, where special issues submitted question of defendant's malice, and malicious intent to injure plaintiff, answers to the former in the affirmative and to the latter in the negative *held* not inconsistent; the one being on the issue of exemplary damages, and the other on the issue of actual damages.

**3. Evidence ☞543(3)—Witness held qualified to testify as to market value of oil lease.**

Witness, who had made extensive investigation of oil lands in vicinity, knew conditions, and had purchased overriding royalty running through one entire section, *held* qualified to testify as to value of leasehold in vicinity.

**4. Evidence ☞546—Determination of expert's qualification within province of trial court.**

The determination of the qualification of a witness to testify as to value is peculiarly within province of trial court.

**5. Libel and slander ☞139—Evidence of value of overriding royalty under oil lease held to sustain special finding.**

In suit for slander of title of oil lease, evidence of value of leasehold *held* sufficient to sustain jury's special finding of value.

**6. Libel and slander ☞139—That oil lease, valuable at time of slander, subsequently became worthless, immaterial on measure of damages.**

In suit for slander of plaintiff's title to oil lease, based on letter from defendant to oil company which had contracted to purchase lease, the fact that shortly after the breach of such contract, because of matters stated in such letter, the lease became of little value, *held* immaterial; the value of lease, at time sale was prevented by defendant's wrongful act, being the decisive factor in measuring damages.

**7. Trial ☞352(4)—Submission of issues properly refused, where without support in evidence.**

Where evidence in suit for slander of title showed that defendant's letter was sole moving cause for loss of sale of oil lease, defendant's request for submission of questions as to whether purchaser would otherwise have discovered cloud on plaintiff's title was properly refused as without support in evidence.

**8. Libel and slander ☞139—Instruction that plaintiff did not authorize co-owner to sell interest to defendant held proper.**

In suit for slander of title to oil lease, instruction that plaintiff's letter to his co-owner, relied on by defendant as authority of co-owner to sell plaintiff's interest, as a matter of law gave no such authority, *held* proper; the letter being clearly insufficient to confer the authority claimed.

**9. Libel and slander ☞139—Instruction that plaintiff's co-owner made no attempt to sell to defendant plaintiff's interest held warranted by evidence.**

In action for slander of title of oil lease in which defendant claimed that plaintiff's co-owner was authorized to sell, and did sell, plaintiff's interest to defendant, evidence *held* to warrant instruction that co-owner made no such attempt to sell plaintiff's interest.

**10. Trial ☞352(4)—In suit for slander of title, special issues held properly refused as without support in evidence.**

In suit for slander of title to oil lease, in which defendant claimed that plaintiff had authorized his co-owner to sell plaintiff's interest to defendant, special issues requested by defendant, submitting question whether plaintiff intended to authorize co-owner to so sell plaintiff's interest, *held* properly refused under the evidence.

**11. Appeal and error ☞1053(5)—Reception of evidence on issue not submitted to jury held not error.**

In suit for slander of title, admission on behalf of plaintiff of evidence on an issue not submitted to the jury *held* not error.

**12. Appeal and error ☞901—Appellant, objecting to reception of evidence, should show affirmative error by statement, excluding all grounds of admissibility.**

Appellant, by bill of exception or by statement must show affirmative error in the reception of evidence objected to as self-serving declaration, excluding all grounds on which such evidence would have been admissible.

**13. Appeal and error ☞1052(2)—Erroneous reception of evidence harmless, where same evidence introduced by appellant.**

Error in reception of self-serving declarations contained in telegram was rendered harmless by appellant's subsequent introduction of telegram as matter of defense.

**14. Libel and slander ☞139—All relevant testimony as to defendant's motive admissible.**

In suit for slander of title, malice being an essential issue, all relevant testimony tending to show motive that prompted the act is admissible, not necessarily to prove truth of statements made to defendant, but to show that such

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted February 25, 1925.

statements were made to him, and their effect on his mind.

**15. Appeal and error ⬤▭1170(7)—Exclusion of testimony not prejudicial, where same facts disclosed by other testimony.** ·

In suit for slander of title to oil lease, the exclusion of testimony of officers and agents of defendant oil company as to their reliance on statements made by another agent *held* not prejudicial error, in view of rule 62a of Court of Civil Appeals, where agent making statements was permitted to fully testify as to such statements, the facts and circumstances upon which he made them, and his communication of them to his superiors, so that jury were fully informed as to facts which excluded testimony would have revealed.

**16. Libel and slander ⬤▭139—Exclusion of testimony as to rule of defendant's business not error, where other testimony showed rule violated in case in question.**

In suit for slander of title to oil lease, defended on the ground that defendant in good faith had purchased plaintiff's interest from co-owner, testimony that it was a rule of business of defendant not to purchase undivided interests in leases was properly excluded, where other evidence conclusively showed that defendant negotiated for purchase of undivided interest of plaintiff's co-owner.

**17. Libel and slander ⬤▭139—Special issue as to damages, and jury's answer thereto, held properly construed by court.**

In suit for slander of title to oil lease, special issue as to damages, requiring jury to find the difference between sales value of lease and overriding royalty, and what the overriding royalty could have been sold for, and jury's answer thereto, *held* properly construed by the court in entering judgment.

**18. Trial ⬤▭352(1)—Special issues held not on weight of evidence.**

Special issues, in suit for slander of title to oil lease, *held* not on weight of evidence.

**19. Libel and slander ⬤▭139—Instruction measuring plaintiff's damages for loss of sale of oil lease by defendant's subsequent offer properly refused.**

In suit for slander of title to oil lease, instruction measuring plaintiff's damages by defendant's offer, after the slander had caused plaintiff's sale to another oil company to be lost, was properly refused; plaintiff's measure of damages being the loss of his bargain, and being unaffected by any bargain subsequently offered by defendant. ·

**20. Trial ⬤▭260(10)—Refusal of instruction, substantially covered by one given, not error.**

The refusal of an instruction on market value substantially the same as one given, is not error.

Appeal from District Court, Jefferson County; E. A. McDowell, Judge.

Suit by Marrs McLean against the Humble Oil & Refining Company. Judgment for plaintiff, and defendant appeals. Affirmed.

E. L. Noll and C. W. Howth. both of Beaumont, and Jno. C. Townes, Jr., and G. P. Dougherty, both of Houston, for appellant.

W. D. Gordon and E. E. Easterling, both of Beaumont, for appellee.

WALKER, J. In this case appellee recovered a judgment against appellant for the sum of $19,850.50 for slander of title.

Appellee alleged that he owned a ½ interest in an oil lease of 25 acres of land in Liberty county, which he had contracted to sell to the Gulf Production Company for $750 per acre, reserving a ¼ royalty interest, and that he lost his trade because of the wrongful, willful, and malicious acts of appellant in slandering his title, in that appellant wrote a letter to the Gulf Production Company on the 5th day of June, 1920, claiming to be the owner and holder of appellee's interest in the lease under a sale contract.

Appellant answered by the usual demurrers and denials, and specially denying that appellee had a valid contract with the Gulf Production Company, and by special pleas to the effect that it, in fact, had acquired appellee's interest in the lease; that it acted in good faith in writing the letter; and that on the same day the letter was written it filed suit in Liberty county against appellee for specific performance of the sale contract under which it claimed appellee's interest in the lease, and had lis pendens notice thereof recorded in the lis pendens records of Liberty county on that day, and that the Gulf Production Company knew of this suit, or would have known thereof before consummating its trade with appellee and paying him the consideration agreed upon, and that, because of such suit, the Gulf Production Company would have breached its contract with appellee, if any it had. Other features of the answer will be disclosed in connection with the discussions of the propositions urged. The case was submitted to a jury upon the following special issues, answered as indicated:

"(1) Did the letter written by the defendant to the Gulf Production Company on June 5, 1920, prevent the Gulf Production Company from carrying out its proposed deal and purchase with Marrs McLean? You will answer this question 'yes' or 'no,' as you may find the fact to be."

Answer: "Yes."

· "(2) Was the defendant actuated by malice in writing and delivering said letter to the Gulf Production Company? That is, Did it act without honestly believing in good faith, on probable cause, that it had acquired the McLean interest in said lease? You will answer this question 'yes' or 'no,' as you may find the case to be."

Answer: "Yes."

"(3) What do you find to be the market or sales value of the 3/28 overriding royalty interest which McLean would have received from

the Gulf Production Company at that time? You will state the total amount in figures which you may find in answer to this question."

Answer: "$12,162.50."

"(4) Did the defendant, knowing that it had no right to the plaintiff's property, with the intent maliciously to injure him, write and deliver said letter to the Gulf Production Company? You will answer this question 'yes' or 'no,' as you may find the fact to be."

Answer: "No."

"(5) If you have answered question No. 4 'yes,' you will then determine what amount should be assessed against the defendant as punitive or exemplary damages in addition to and apart from actual damages, and fix the amount which you may find as punitive damages in such sum as you may find that the plaintiff should recover."

Answer: "————."

"What do you find to be the difference in the sales value between $750 per acre bonus and ¼ overriding royalty, and what the lease could have been sold for, and what the overriding royalty thereafter obtainable could have been sold for at any time after June 21, 1920, and the time the operations in the vicinity of the lease in question were abandoned?

"The above and foregoing charge is given at the request of counsel for defendant, and same will be considered by you along with and as a part of the court's main charge, and this is submitted as question No. 6.

"In explanation of your answer to question No. 6, in order that your intention may be clearly expressed, you are requested to state what you find to be the bonus value after June 21, 1920, and what you find to be the royalty value after that date."

Answer: "$1,687.00.

| | |
|---|---:|
| Royalty | $1,250.00 |
| Bonus | 437.00 |
| | $1,687.00" |

In assessing appellee's damages under this verdict, the court allowed him $750 an acre for 12½ acres, being ½ of the 25-acre lease, and $12,162.60, the value of the overriding royalty retained by appellee, making a total sum of $21,537.50, from which the court deducted $1,687, the amount found by the jury under question No. 6, leaving a balance of $19,850.50. The ³/₂₈ overriding royalty submitted to the jury in question No. 3 is the difference between the ¼ royalty interest reserved by appellee in his contract with the Gulf Production Company and a ⅛ royalty interest owed by appellee to the fee holder and a 1/₃₆ owed by appellee to his immediate vendor.

[1] While appellant asserts that the court's charge to the jury was a general charge, it points out no specific elements of the charge rendering it subject to that objection. Hence in our judgment, an exception that "said charge is a general charge," which is the only exception made, is too general to require a review on our part. Without quoting the charge in full, it is sufficient for us to say that it is in no sense subject to that

exception. As appears from the questions given, supra, the charge was submitted on special issues, and the court's judgment was based on the answers returned.

[2] Appellant further insists that questions Nos. 2 and 4 submit to the jury the same issue, and, therefore, as question No. 2 was answered "Yes" and question No. 4 was answered "No," a conflict exists in the jury's verdict on the same material issue, and the verdict cannot sustain the judgment. There is nothing in this contention. Question No. 2 was on the issue of actual damages, and question No. 4 was on the issue of exemplary damages. The court's charge, as these issues were presented to the jury, made this clear, and, as the jury refrained from answering question No. 5, it must be that they understood the nature of these two issues, and that question No. 2 was answered as awarding appellee actual damages, and question No. 5 was not answered on the ground that the necessary elements were not found to sustain a finding of exemplary damages.

[3] The court did not err in receiving the evidence of the witness W. E. Orgain on the issue of market value of appellee's leasehold interest as against the objection that the witness had no general knowledge of the value of such royalties in the vicinity of the land under inquiry, and that he did not know of a single sale or purchase of royalties of oil or other minerals coming from any land in the vicinity of the tract of land under consideration, save and except one purchase made by himself. Answering appellant's proposition, appellee made the following statement and argument, which we quote with approval:

"In this case the witness Orgain testified the purpose and object of his investigation and inquiries, which was to ascertain the values over there, and he gives the length of time that he prosecuted this inquiry to ascertain such values, which was from the 1st of May until along in the middle of June. An investigation covering this period of time gave the witness ample opportunity to form an opinion as to these values. Further, the witness showed by his statements that he understood the locations of the lands out there, and had studied maps giving the locations of the lands in that vicinity, and that there was a difference in the values of land according to their location, and that he could testify as to the value of different tracts of land, only when he was advised by maps of their definite location. He testified that he could not tell the reasonable sales value of a royalty on a piece of property, unless he was told the location of the property inquired about. It seems to us that these statements by the witness evidenced that he had gathered from his inquiry definite information as to the values of property according to their location out there. The witness says: 'I cannot tell you what was the reasonable sales value of an overriding royalty of ⅛ over a ⅛ in this field on June 5, 1920, because I cannot tell what property you are in-

quiring about and you have not stated whether the royalty was a ⅛ to the landowner, or whether it was an overriding ⅛ royalty. I would have to have something more definite than that. If you will show me the map and the location of the land you are inquiring about, and whether it was an overriding royalty, I will undertake to answer.'

"The witness further testified: 'I do not know generally what royalties were selling for in that field, but I know something about the conditions, and I know that I purchased some in there. My recollection now is that my information consisted of my inquiry concerning values over there from some time about the 1st of May up until along in the middle of June, 1920. I do not recall the date on which Simms' well No. 2 came in; my recollection is my attention was called to the situation along about May 31, 1920. From my investigations and inquiries I thought the property was worth $2,800.'

"The witness further testified: 'The values in my mind are fixed by the conditions as they existed there at the time. Let me see the map. I have not talked to any one about this and I do not know where the property is. I want to know its relation to the ground. It would depend on what its relation to the hill is. Distance one way would absolutely destroy its value and distance the other way might make it valuable.' This testimony showed that the witness had an absolute familiarity with the location of the land and the values of land there with respect to their location with relation to the hill, and that the values were fixed in his mind by the conditions as they existed there at the time.

"The witness continued: 'If it was on the southwest and around the hill, it would be good stuff. If you were going east, I wouldn't give you anything for it, or, if you were going due west, I wouldn't.' The witness here examined the map, exhibited and located the 25-acre tract out of the northwest corner of section 134, and testified further:

" 'The royalty that I purchased ran all the way through section 135, H. & T. C. Ry. Co., and I bought an overriding royalty.'

"While the witness only made one purchase, yet from this statement it is shown that this one purchase covered all the land in an entire section of land. If this had been cut in 25-acre tracts instead of being bought by him as a whole, it is readily seen how many purchases it would make. The fact is that his purchase, although only in one transaction, consisted of a purchase of an undivided interest of the whole 640 acres of land which comprised a large part of the oil field around the Simms' well.

"The witness further testified as to what the land was worth at different times owing to the development in the Simms' well. He states: 'About 3 days after the well came in, that property around there was worth a good deal, and about a week or 10 days afterward it was not worth so much. A few days after the well came in it was real valuable stuff. You see I paid on the basis of $850 an acre, overriding on the basis of an ⅛ when the showing was reported as good. When the well came in, I thought it was worth more than I paid for it, but it proved not to be worth anything. I don't remember the date on which it became worthless. It was a fluke absolutely, and after that

I didn't keep up with it very much. One report that I got was that it was making 2,000 barrels and the next time I heard from it it wasn't making anything scarcely. I know that I didn't get but a very little royalty out of it. I think I got $11 and something out of it. I know it quit in a few days. It is pretty hard to tell just what that would be sold for, but I judge under conditions there being a well located there that that was worth anywhere from, oh, $800 to $1,500. It is impossible to accurately estimate those things. One man will pay you more than another man; it all depends on how bad a man wants it. Any man would have paid that for it at that time.'

"The witness by this testimony showed that his knowledge of the sales value of royalties on this land was actually acquired through observation of the conditions there through the period of time from the 1st of May until about the 15th of June and actual purchase made by him, and we submit that his evidence in every way amply qualified him to testify as to such values, and we submit that his testimony, qualifying him to testify, comes squarely within the rule announced by the cases cited by appellant.

[4] "It is peculiarly within the province of the trial court to determine the qualification of a witness in determining whether he is qualified to testify in reference to value. Railway Co. v. English, 42 Tex. Civ. App. 393, 93 S. W. 1096; El Paso Ry. Co. v. Smith, 50 Tex. Civ. App. 10, 108 S. W. 988; M., K., & T. Ry. Co. v. Hedric (Tex. Civ. App.) 154 S. W. 633; Studebaker Harness Co. v. Gerlach (Tex. Civ. App.) 192 S. W. 548."

[5] This discussion also disposes of appellant's thirteenth proposition, that no evidence was offered on the issue of market value, and the fourteenth proposition, that the evidence on this issue was too indefinite and uncertain to sustain the finding of the jury, and that the jury's finding in answer to question No. 3 was arbitrary and without support.

[6] The wells that were being drilled on the 5th day of June, 1920, soon showed that appellee's lease was, in fact, entirely without value as oil-producing property, and it, together with all the surrounding land, was abandoned and not further developed. Because the subsequent history of this territory showed that this land had no actual value as oil-bearing property, appellant now insists that appellee cannot recover anything by reason of the supposed value at the time it caused the breach of the contract between him and the Gulf Production Company. There is no merit in this contention. The subsequent development of this territory had nothing whatever to do with the market value of appellee's leasehold interest on the 5th day of June, 1920. That question was submitted to the jury on the facts as the buying public believed them to be on the 5th day of June, 1920, and on the facts as they were presented to and accepted by those dealing in leases of the character and situation of appellee. Had this lease proven to be the most valuable in oil history, it would not

have increased appellee's measure of damages, and the fact that it proved worthless within a few days after June 5th does not lessen his damages. The issue was properly tried on the status of June 5th, the day the letter was written.

Under its allegations that the Gulf Production Company would have refused to conclude its trade with appellee because of the pendency of the suit for specific performance as filed in Liberty county, appellant requested the court to submit three questions to the jury, in substance as follows:

(1) Would the Gulf Production Company have required of appellee an abstract before paying the purchase money on the lease?

(2) Would an investigation of the abstract have disclosed the pendency of appellant's suit against appellee for specific performance?

(3) Would the disclosure of the pendency of the suit have prevented the consummation of the trade?

[7] The refusal of these questions was not error. Without a scintilla of evidence to the contrary, it appears from the record that the Gulf Production Company refused to consummate the trade and pay appellee the purchase money because of the letter received by it from appellee. The Gulf Production Company knew nothing of the filing of the suit in Liberty county when it withdrew from its contract. Appellant could not be relieved from the consequences of its wrongful act by a statement of facts that did not contribute in the least to the resulting injury.

[8, 9] The court did not err in charging the jury:

"You are instructed that the evidence in this case as matter of law shows that Marrs McLean did not give authority to W. D. Gordon to make a sale of his interest in the leased premises in controversy, and that W. D. Gordon did not attempt to sell the interest of Marrs McLean in said property."

Appellant makes the following statement in connection with its argument on this proposition:

"As stated before, the lease was owned by W. D. Gordon and Marrs McLean, each holding an undivided ½ interest, and it seems perfectly clear that the Humble people understood and believed that the entire 25-acre lease was owned by W. D. Gordon when the negotiations for the purchase of the lease opened, and for a long time afterwards. The first letter that was written by H. C. Wiess to W. D. Gordon at Wichita Falls on May 21st spoke of and described this lease as a 25-acre lease, and all of the correspondence introduced into the record showed that they thought they were dealing with a proposition to buy the 25-acre lease, and Bates testified most positively that he went to Gordon, and discussed the purchase of this lease with Gordon, and made Gordon the proposition to buy it, and Gordon made him a counter proposition and he (Bates) took up the matter of accepting Gordon's proposition with the Houston office, and got authority to accept it, and, when he went back to the office of Gordon, he was told for the first time that Marrs McLean owned the ½ interest in the lease.

"The record shows that W. D. Gordon on May 27, 1920, sent to Marrs McLean at Beaumont the following telegram: 'Marrs McLean, care Jim Sutton. Humble wants 25-acre lease at Dayton section 134. Have started negotiations 1/6 royalty through Harry Wise. What bonus should be asked? Look over situation and wire me. Think Simms' well must be showing. All well.
[Signed] W. D. Gordon.'

"On May 28, 1920, Marrs McLean at Beaumont, Tex., wrote a letter to W. D. Gordon at Wichita Falls, Tex. The original of this letter was not offered in evidence, but a copy of the same was offered, and the substance of this letter was set forth in the letter written by W. D. Gordon to H. C. Wiess, dated June 11, 1920. This letter was written in reply to a telegram by Gordon to Marrs McLean of date May 27, 1920. McLean, in this letter to Gordon, says: 'I do not know what is doing, but thought it good enough to play pretty strong. I would not be interested in less than $500 an acre and 1/5 royalty. Suggest that you may ask them for offer on 1/5 royalty basis. Oil chances are thinning down too much and good bets are too scarce not to hold out for royalty in preference to more bonus.'

"G. E. Bates, the agent of the Humble Oil & Refining Company, who negotiated the purchase of the lease from W. D. Gordon, testified on the witness stand that, when he went back to W. D. Gordon's office the second time, he went into Gordon's office; that Gordon had in his hand a letter; and that Gordon said to him: 'I have just received this letter from my partner, Mr. McLean, and he is a brother-in-law of mine, and knows more about it then I do, and he is a practical oil man and I am not, and he wants $500 an acre bonus and 1/5 royalty, and that is my price, and, if you want to trade, you will have to trade now.'

"The witness Bates testifies positively that he did not read the letter; that Gordon purported to tell him what was in the letter, and pushed the letter across the table at him (Bates), and thereby invited Bates to read the letter, and Bates testifies that he did not read it, but says that Gordon read some parts of the letter to him (Bates). This letter of May 28, 1920, hereinbefore mentioned, was never in the possession of the Humble Oil & Refining Company, or any of its officers or agents, and they had no knowledge of the contents of this letter, except from G. E. Bates, until W. D. Gordon wrote the letter of June 11, 1920, to H. C. Wiess, vice president of the Humble Oil & Refining Company, which letter is to be found on pages 127 to 133 of the Statement of Facts. This letter was in the hands of Gordon, and exhibited to Bates at the time the trade was closed on the afternoon of May 31, 1920, but Bates testified, as stated above, that he did not read the letter, but Gordon purported to tell him the contents of it, and read some portion of the letter to Bates, and Bates testifies positively that he understood and believed that he was making a trade for the entire 25-acre lease, and that Gordon had been authorized by McLean, through the letter, to close the trade for him (McLean), for his interest in the lease.

"Immediately after signing the formal assignment of the lease, W. D. Gordon wired McLean as follows: 'Letter received. Traded with Humble five hundred dollars bonus 1/5 royalty.'

"The answer to this telegram from Marrs McLean was received on the following day, June 1, 1920: 'Trade does not suit me. Advise them that I will not join with you. Simms has 2,000 barrel well.'

"On the trial of this case the defendant requested special issue R; also special issue No. 1; also special issue No. 2.

"The defendant requested special issue R, which reads as follows: 'Did the plaintiff intend to authorize W. D. Gordon to sell his interest at $500 an acre bonus and 1/5 royalty before it was reported that the Simms' well was in, and thereafter, on the same day, after being advised that the Simms' well was in, deny that he had given such authority for the purpose of obtaining more for his interest.'

"Defendant also requested special issue No. 1, which reads as follows: 'Did the plaintiff in his letter to W. D. Gordon of May the 28, 1920, intend to convey to Gordon the idea that he (McLean) was willing to sell his interest in the lease for $500 per acre bonus and a 1/5 royalty? Answer this "yes" or "no." And in answering this question you will take into consideration all the facts and circumstances in evidence before you, and construe said letter and the intent and effect thereof in the light of the telegram sent by W. D. Gordon to Marrs McLean on May the 27, 1920, and all other facts and circumstances in evidence.'

"And the defendant also requested special issue No. 2, which reads as follows: 'Did W. D. Gordon understand from the letter of Marrs McLean to him of May the 28, 1920, that Marrs McLean was willing to sell his interest in the lease for $500 per acre bonus and a 1/5 royalty? Answer this question "yes" or "no." And in answering this question you will take into consideration all the facts and circumstances in evidence before you and construe said letter in connection with the telegram sent by Gordon to McLean May the 27, 1920.'

"All three of these special issues were refused by the court, and the action of the court in refusing these special issues was complained of in the eighteenth, nineteenth, and twentieth paragraphs of the motion for a new trial."

In concluding its argument under this proposition, appellant says:

"The question as to whether or not the peremptory instruction of the court to the jury, to the effect that, as a matter of law, Marrs McLean did not authorize W. D. Gordon to make a sale of his interest in the lease, is correct, depends almost entirely upon the letter written by Marrs McLean to W. D. Gordon on May 28, 1920, set forth above, and if this court is of the opinion that this letter did not authorize Gordon to close the trade for McLean for McLean's interest in the lease; still the witness G. E. Bates testified to the effect that Gordon undertook to sell the interest of McLean in this lease, and, while Gordon denies that he made any effort to sell the interest of McLean, it is not within the province of the court to take this question away from the jury. The defendant duly excepted to the action of the court in taking these two questions from the jury."

[10] It is clear to us from our construction of the letter from McLean to Gordon that he did not authorize Gordon to sell his interest in the lease, and under the admission of appellant, as just quoted supra, the court did not err in so charging the jury. Nor did the court err in further charging that Gordon did not attempt to sell the lease. The witness Bates gives what was said and done between him and Gordon. From this testimony it appears that Gordon was dealing openly with Bates, and it further appears that Gordon did not attempt to bind McLean; that Bates knew that McLean owned a ½ interest in the lease, and must have known the contents of the McLean letter, though he says he did not read it. However, he says Gordon read to him a part of it. The letter is so short that we do not see how Gordon could have read any of it without advising Bates of its contents, at least to the extent that any ordinary business man would have asked to see or hear the letter read in full before contracting on its terms. But giving to Bates' testimony its fullest import, he disclosed no facts showing that Gordon had attempted to sell him the McLean interest, and his construction of these facts, that Gordon did so contract, is a mere conclusion on his part, without any probative force. This disposes also of the court's refusal to submit the special issues embodied in appellant's statement supra.

Under its proposition that the court erred in admitting self-serving declarations, appellant makes the following statement:

"W. D. Gordon, while on the witness stand, testifying on behalf of the plaintiff, testified that on June 5, or June 6, 1920, he received a telegram from Marrs McLean, making inquiry as to whether or not he (Gordon) had made and entered into a contract with the Humble Oil & Refining Company as agent for him (McLean) binding him (McLean) to sell and assign to the Humble Oil & Refining Company his interest in the 25-acre lease, and that, in reply to said telegram, he sent a telegram from Wichita Falls, Tex., on June 6, 1920, to Marrs McLean at Beaumont, Tex.; in reply to the telegram received by him from McLean, which telegram reads as follows:

" 'Wichita Falls, Tex., June, 6, 1920.

" 'Marrs McLean, Beaumont, Texas.

" 'Wire received. I did not attempt to bind you. Showed them your letter and said I thought you would sign. They took that chance. If they sue you I will intervene and ask rescision. Hope you make them come across.

" '[Signed]    W. D. G.' "

[11-13] If we are correct in our disposition of the issues, immediately supra, then the admission of this evidence was not error, since it was on a question that could not go to the jury, and was not, in fact, submitted to the jury. The only objection

to this evidence was, quoting the bill of exception, "on the ground that it was a self-serving declaration." Neither the bill of exception nor the statement made by appellant reflects the circumstances or conditions under which this evidence was offered, other than it was while the witness was testifying "on behalf of plaintiff," and that he had received a certain telegram from appellee. Appellant should have shown by its bill of exception or by a statement from the record affirmative error; that is to say, a statement should have been made in connection with the proposition excluding all grounds on which this evidence would have been admissible. This was not done. But, if error was committed in the reception of this evidence, it was rendered harmless by the subsequent act of appellant reintroducing the telegram as a matter of defense.

[14, 15] We agree with appellant that, when malice is an essential issue, all relevant testimony tending to show the motive that prompted the act is admissible, not necessarily for the purpose of proving the truth of such statements as may have been made to the party charged with the act, but merely to show that the statements were made to him and the effect they had upon his mind. Goldstein v. Morgan, 122 Iowa, 27, 96 N. W. 897; Keenhold v. Dudley (Iowa) 151 N. W. 1076; York County Bank v. Carter, 38 Pa. 446, 80 Am. Dec. 494; U. S. v. Gentry, 119 F. 70, 55 C. C. A. 658. But this proposition does not invoke error in this case. R. S. Sterling, the president of appellant, wrote the letter that caused appellee to lose his bargain with the Gulf Production Company. Appellant was defending on the issue that this letter was written in good faith and not in malice, and, therefore, appellee had no cause of action for slander of title. Since good faith would rebut malice, which is an essential element of this character of litigation (Haldeman v. Chambers, 19 Tex. 56; Hines v. Lumpkin, 19 Tex. Civ. App. 556, 47 S. W. 818; Fant v. Sullivan [Tex. Civ. App.] 152 S. W. 515; 25 Cyc. pp. 559, 560, and 564), appellant was entitled to the benefit of all evidence that would explain or in any way throw light on the motive actuating Sterling in writing the letter. The following statement is made by appellant in support of its proposition that the court erred in excluding relevant testimony on the issue of malice:

"R. S. Sterling, on the trial of this case, was called by the defendant as a witness, and testified that, after the conference that he had with Marrs McLean on June 5, 1920, at his office in the city of Houston, with reference to the 25-acre lease involved in this suit, he directed R. D. Farish, the head of the leasing department of the Humble Oil & Refining Company, to write and deliver the letter to the Gulf Production Company, which is set forth in the plaintiff's petition as the cause of action sued on herein.

"And the said Sterling further testified that at the same time he directed the suit to be brought in the district court of Liberty county by the Humble Oil & Refining Company against W. D. Gordon and Marrs McLean to enforce specific performance of the contract against Marrs McLean, and the said R. S. Sterling testified that, in directing the writing of the said letter of June 5, 1920, to the Gulf Production Company, and in directing the filing of the suit against Marrs McLean, he acted upon information received by him from R. D. Farish, the head of the leasing department of the Humble Oil & Refining Company, and from G. E. Bates, who was in the service of the Humble Oil & Refining Company at Wichita Falls, Tex., as a land man, acting under directions from R. D. Farish, the head of the leasing department, and, when he was requested to detail the information upon which he acted, and state what said information was in having said letter written, and in having said suit filed, the court excluded any and all statements on the part of the said witness as to what information he acted upon in writing said letter, and why he wrote the same, or caused it to be written, and if the court had permitted the witness to answer, the witness would have answered that, in writing said letter of June 5, 1920, or causing it to be written to the Gulf Production Company, advising said company that the defendant had purchased the lease in question from Marrs McLean, he acted upon information communicated to him by Mr. G. E. Bates, the agent of the defendant company at Wichita Falls, who negotiated the transaction with W. D. Gordon, the information furnished him by R. D. Farish, the manager of the leasing department of the defendant company at Houston. In substance and effect, that Mr. Bates opened up negotiations with W. D. Gordon for the purchase of the 25-acre lease in question, and that he was authorized to offer W. D. Gordon for the entire lease the sum of $125 per acre bonus and a 1/6 royalty; that the said Gordon declined to accept same, but offered to take $200 per acre bonus and 1/6 royalty, and that thereupon he (Bates) telephoned the said R. D. Farish, and Farish authorized him, the said Bates, to close the trade with W. D. Gordon on that basis; that, upon his (Bates') return to Gordon's office at Wichita Falls, Gordon exhibited to Bates a letter that he (Gordon) claimed he had just received from Marrs McLean, the plaintiff, and which said letter Bates did not read, but accepted and believed to be true the statements then and there made by W. D. Gordon at the time he exhibited it as to its contents; and that at the time said Gordon exhibited said letter he (the said Gordon) said: 'I have just received this letter from my partner, Mr. McLean, and he authorizes me to sell for $500 per acre bonus and 1/5 royalty, and if you want to trade you will have to trade now,' and that the said witness did then and there make the trade with W. D. Gordon for himself and for Marrs McLean, being duly authorized by Marrs McLean by said letter on the basis of $500 per acre and 1/6 royalty for said lease. The court, upon the objection of the plaintiff, excluded said statement and testimony of the witness Sterling as hereinbefore detailed as to what he would have testified to had he been so permitted, refusing to permit same to go before,

or be considered by, the jury, for the reason given that it was hearsay, and the defendant duly excepted thereto.

"On the trial of the above-styled cause, R. D. Farish was on the witness stand testifying as a witness for the defendant, and, after defendant had proved that the said R. D. Farish, at the time, and long prior to the transaction in question, was general manager of the land and leasing department of the defendant Humble Oil & Refining Company, and that he directed negotiations for the purchase of the 25-acre lease in question from his office in Houston by telephoning to Mr. G. E. Bates, the agent of the company at Wichita Falls, where the negotiations were carried on with W. D. Gordon, and that he, together with Mr. R. S. Sterling, president of the defendant company, wrote or directed the letter of June 5, 1920, by the Humble Oil & Refining Company to the Gulf Production Company, complained of by the plaintiff, the defendant then offered to prove, and could and would have proven by the said witness, had the defendant been permitted to do so by the court, that he wrote said letter in good faith and relying upon information obtained from G. E. Bates as to the facts connected with the purchase, and that such information by Mr. Bates, upon which he relied, was that he (Bates) had purchased for the defendant Humble Oil & Refining Company the lease upon the entire 25 acres from Mr. Gordon, and through Mr. Gordon from Mr. McLean, and that the plaintiff had authorized the sale, and agreed to accept the sum of $500 per acre and 1/5 royalty, in a letter which he (the plaintiff) had written to W. D. Gordon, and the court, on the objection of the plaintiff that this evidence was hearsay, excluded all of said testimony and refused to permit the same, or any part thereof to go before, or be considered by the jury, and the defendant then and there duly excepted.

"While the witness E. E. Townes was on the stand testifying as a witness for the defendant, after proving by the witness that he was the general counsel for the defendant, and that he held said position during the year 1920, and that he was consulted by the officers of the defendant company with respect to the writing of the letter of June 5, 1920, by the Humble Oil & Refining Company to the Gulf Production Company, and that he approved the writing of said letter, and that he also directed the filing of the suit of Humble Oil & Refining Company against Marrs McLean in the district court of Liberty county for the specific performance of the contract to convey to the Humble Oil & Refining Company all of the 25-acre lease in question, and the defendant offered to, and could have, and would have proven by said witness that, at and before the time of writing said letter and filing said suit, he was informed by the officers of defendant company that W. D. Gordon had sold the lease on the entire 25-acre tract to the defendant, and that Marrs McLean had authorized the sale of his undivided interest in said lease by letter to W. D. Gordon, signed by plaintiff Marrs McLean, and the court, on objection of the plaintiff, excluded said testimony and refused to permit the same to be considered by the jury, to which the defendant duly excepted.

"The question of the exclusion of the testimony of the three witnesses, R. S. Sterling, R. D. Farish, and E. E. Townes, is raised by the seventy-third, seventy-sixth, seventy-seventh and seventy-eighth paragraphs of defendant's motion for new trial."

Also we refer to our statement, supra, of the evidence of the witness Bates. From the statements thus made, it is clear that all three of the witnesses, Sterling, Townes, and Farish, testified that they acted in good faith in writing the letter that caused appellee to lose his bargain. It is also clear that the jury had every essential fact before them that these witnesses could have testified to. Bates had related in detail just what had occurred between him and Gordon, and him and his superiors in the employment of appellant. There was no suggestion of surprise to appellant on any phase of Bates' testimony, nor that Bates had refused to testify to all that he had told Sterling, Townes, and Farish. Bates, therefore, gave to the jury every fact that Sterling, Townes, and Farish could have revealed. Since no issue was made that Bates did, in fact, communicate the substance of his testimony to Sterling, Townes, and Farish, we do not think that any additional weight could have been given thereto by the excluded testimony. The error, if any, in the exclusion of this evidence comes clearly within the provisions of rule 62a.

[16]. The exclusion of the testimony offered by the witness Bates, to the effect that it was a rule of the business of the defendant company not to buy undivided interests in leases, was not error, because it appears that this witness knew that Gordon owned only, an undivided interest in the lease when he contracted with him, and that the witness fully appreciated the fact that he would have to acquire McLean's signature to the contract, in addition to securing Gordon's signature thereto. And, while the witness Bates testified that he himself did not know of McLean's interest until a short while before he concluded his contract with Gordon, we think the record shows without controversy that the superior officers of appellant knew, from the inception of the negotiations with Gordon that he owned only an undivided interest. Then, since appellant was dealing with Gordon and McLean in respect to their individual moieties, the existence of a general rule to the effect suggested by Bates', excluded testimony would have no probative force on the determinative issues of this case.

If it was the duty of appellee to use every reasonable effort to sell and assign his interest in the lease after appellant dismissed the suit for specific performance, and thereby reduce the amount of damages to him by the writing of the letter, the jury convicted him of a breach of that duty, and penalized him in the sum of $1,687, which, as we have already shown, was deducted by the

court from the total amount of damages in rendering judgment in appellee's favor.

[17, 18] The court correctly construed its sixth special issue, and the jury's answer thereto, as relating to the bonus value of the lease as a whole and not to its value per acre. This construction, we think, arises from the wording of the issue and the instructions relating thereto. But it is also aided by a consideration of the evidence on the issue of value subsequent to the date the suit was dismissed. Since the suit was dismissed, on June 21, 1920, it appears from the evidence that the lease had but little, if any, value. There is no merit whatever in appellant's proposition that the issues submitted were on the weight of the evidence.

[19] Appellant's seventeenth proposition is as follows:

"The defendant was liable to the plaintiff, if for anything, for the difference in the market value between $750 cash per acre and ¼ royalty offered to him by the Gulf Production Company, which was not accepted, and the $1,000 cash per acre and a 1/5 royalty offer made to him by the defendant, which offer was refused by the plaintiff, and the court should have submitted to the jury a special issue thereon, to find the difference in the value of the two offers. This proposition is germane to the twenty fourth assignment of error, on page 17 of appendix."

This proposition is not sound. Appellee did not lose the bargain offered him by appellant, but his contract with the Gulf Production Company. The difference between appellant's offer and the contract with the Gulf Production Company in no sense measures appellee's loss. It seems to us most unreasonable to say that one may wrongfully cause the breach of a contract between other parties, by reason of which one of them suffers great damage and relieve himself of the consequences of his tort by showing that he offered within a few dollars of what the party would have received under the contract breached, when common business prudence would have required the acceptance of the better offer. Appellee's measure of damages was the loss of his bargain, and his bargain was $750 per acre and an overriding royalty of 3/28.

[20] The trial court defined market value as follows:

"By the expression 'market or sales value' is meant what it was reasonably worth and could be sold for at that time regardless of its intrinsic value at that time or of its intrinsic or sales value thereafter."

Appellant requested the court to charge the jury on this issue as follows:

"At the request of the defendant, you are instructed that by the term 'market value or sales value' as used in the main charge of the court is meant 'the price fixed by buyers and sellers in the open market in the usual and ordinary course of lawful trade and competition.'"

We do not understand that there is any substantial difference between the charge given and the one requested. What we have said disposes of all of appellant's 109 assignments of error, covering 64 pages of its printed brief, and its 21 propositions thereunder.

Believing that this case was correctly tried, the judgment of the trial court is in all things affirmed.